U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 FEB -3 PM 1:01

CLERK
BY ᴘᴍ
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:11-cr-65 |
| ) | |
| BRADY CUNNINGHAM ) | |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 12)

This matter came before the court on December 15, 2011 for an evidentiary hearing on Defendant Brady Cunningham's motion to suppress. (Doc. 12.) Defendant is charged with violating 18 U.S.C. § 2252(a)(4)(B), for knowingly possessing child pornography. He seeks suppression of his statements to law enforcement, arguing he was subjected to custodial interrogation outside his home without the benefit of *Miranda* warnings. The Government opposes the motion, contending that any interrogation was noncustodial.

Defendant is represented by Brooks G. McArthur, Esq. The Government is represented by AUSA Christina E. Nolan, Esq.

**I. Factual Background.**

At approximately 6:00 a.m. on May 18, 2011, nine officers arrived at Defendant's home in Burlington, Vermont to execute a federal search warrant. Defendant, who is twenty-one years old, lives at the home with his father, Brian Cunningham. Both were present on the day in question.

The home occupies one side of a two story duplex. On the first floor, there is a small living room (12 x 8 feet) and kitchen (12 x 6 feet) separated by a half wall. Next to the kitchen there is a sliding glass door that opens up onto an outdoor patio. The patio is

uncovered and is partially exposed to the backyard. The bedrooms are located on the second floor of the home.

On the morning in question, law enforcement officers travelled to Defendant's home either separately or in groups. They parked approximately three to four unmarked vehicles and one to two police cruisers along one side of Defendant's driveway[1] and on the street in front of the duplex. The parties dispute whether this left enough room for a vehicle to enter and exit the parking area of the residence. Although a small vehicle could enter and exit without difficulty, it would be cumbersome for Brian Cunningham to maneuver his work van out of the driveway without travelling on the duplex's front lawn. Certainly, a person on foot would have no difficulty in entering or exiting the residence.[2]

Upon their arrival, two or three officers surrounded the house while six or seven officers approached the front door. The officers knocked forcefully on the door and called out loudly that they were law enforcement and had a search warrant. At least two of the officers saw a person looking down at them from an upstairs window. Defendant and his father descended the home's interior staircase to open the front door and, in doing so, Brian Cunningham cut his foot on a sharp object. When Defendant opened the front door, law enforcement entered the house with guns drawn and asked Defendant and his father to "keep their hands in plain sight." Although the firearm of the first officer who entered the home was pointed towards the floor, the second officer momentarily pointed a shotgun at Defendant's neck. At the time, Defendant's father was standing behind the Defendant.

Law enforcement explained that they had a search warrant for the house and that they would first conduct a security sweep for other individuals and firearms. Special Agent Caitlin Moynihan, the lead officer on the search, testified that Officer Frank Piccione told both Defendant and Brian Cunningham they were free to leave while the search was conducted and that, if they left, federal agents would remain at the home.

---

[1] The driveway is approximately 40 to 45 feet long and 20 to 25 feet wide.

[2] Brian Cunningham's brother (who did not testify) arrived during the execution of the search warrant and was allegedly turned away by law enforcement.

Special Agent Garrett Greer, who also testified, did not corroborate this claim and Officer Piccione did not testify. Both Defendant and Brian Cunningham denied they were told they could leave during the search. Brian Cunningham further credibly testified that at one point he asked if he could go outside to smoke and was told he could not. On balance, the court finds that Officer Piccione did not tell the Defendant and his father that they could leave during the search.

Thereafter, for approximately five minutes, law enforcement officers conducted a security sweep of the small living quarters with their firearms drawn. Brian Cunningham told them where they would find firearms. The officers located a loaded shotgun in the kitchen and a handgun in an upstairs bedroom. Once these firearms were secured and it was determined that there were no other individuals present in the home, the officers holstered their own firearms and some of them left. At some point, Brian Cunningham discovered his foot was bleeding and he asked to go into the living room to attend to it. Law enforcement allowed him to do so but denied his request that he be attended to by Defendant who was located several feet away in the kitchen. At least two officers remained downstairs with the Defendant and his father while the security sweep was conducted and the search was underway.

Approximately twenty minutes after law enforcement's arrival and the subsequent departure of several agents no longer needed for the search, Special Agent Moynihan said she "needed" to speak to both Defendant and his father. She told them she would like to tell them what was "going on" and that she wanted to speak to Defendant first. Because the kitchen was too cluttered to permit the three of them to sit down, she or Special Agent Greer suggested the back patio to which Defendant acquiesced. Defendant disputes this account and testified that the agents simply said "Brady, come with us" whereupon he led the agents out to the back patio through the sliding glass door. Because the sliding glass door was partially broken, Defendant was needed to both open and close it and he did so. In light of Defendant's role in providing the officers access to the back patio, the court finds that Defendant was told the officers needed to speak to him outside the presence of his father and thereafter he led them outside to the back patio with this purpose in mind.

3

On the patio, Defendant and the two officers sat down at a circular table approximately four feet in diameter. The parties dispute the seating arrangement. Defendant claims that he sat between the two agents. The agents claim that Defendant sat to Special Agent Moynihan's left. As the table was small and circular, the court does not find this dispute material.

It is undisputed that Defendant was not handcuffed or restrained throughout the interview. It is also undisputed that the patio was visible from the interior of the house where Brian Cunningham remained. Defendant was not touched by either agent and was not verbally or physically threatened. Defendant does not claim that either agent engaged in trickery or deceit. At the time, Defendant, who had completed two years of high school, had no prior experience with the criminal justice system.

Before commencing the interview, Special Agent Moynihan advised the Defendant: "You are not under arrest, you are not obligated to speak to us, you are free to leave at any time, the conversation is consensual." When Agent Greer who was taking notes heard this, he crossed off the *Miranda* warnings he had preemptively started to write down, initialing this change as he did so in recognition that Special Agent Moynihan had decided not to give the Defendant *Miranda* warnings.

The officers noted that Defendant's neighbors were outside and visible from the patio. They asked the Defendant if he felt comfortable with their proximity. Defendant assured them that he did. Special Agent Moynihan advised the Defendant that she was investigating a felony offense. She questioned the Defendant about child pornography to which he gave incriminating responses. At some point in the interview, she again reminded the Defendant that he did not need to speak with them. Defendant agrees that he was told that he did not need to speak to the agents at least once but claims that he was also told that "it would be better for him if he did."

The agents did not promise Defendant that he would not be prosecuted, or that he would be accorded leniency if he answered their questions. Defendant was questioned for approximately forty-five minutes in a normal, conversational tone. He never

4

requested that the interview cease or that he be permitted to leave. Neither he nor his father was threatened with arrest or arrested on the day in question.

## II. Conclusions of Law and Analysis.

Defendant asserts that he was subjected to custodial interrogation without the benefit of *Miranda* warnings because he was "effectively in custody from the moment law enforcement entered his home." (Doc. 12-1 at 4.) If Defendant is correct in this assertion, his motion to suppress should be granted. *See United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). The Government, while not contesting that Defendant was interrogated, denies that the questioning was custodial in nature and argues that it is Defendant's burden to show otherwise.

Most courts, including this one, have held that a criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation.[3] The question "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[.]" *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "Once the scene is set and the players' lines and actions are

---

[3] *See United States v. Davis*, 792 F.2d 1299, 1308 (5th Cir. 1986) (noting that defendant "had the burden of proving that he was under arrest or in custody" when seeking to suppress statements); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Shteyman*, No. 10 CR 347 (SJ), 2011 WL 2006291, at *14 (E.D.N.Y. May 23, 2011) ("The Court notes that on a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation."); *United States v. Artis*, No. 5:10-cr-15-01, 2010 WL 3767723, at *4 (D. Vt. Sept. 16, 2010) ("The weight of authority appears to hold that a defendant bears the burden of establishing that he or she was subjected to custodial interrogation in order to establish a constitutional violation as the basis for suppression of evidence."); *United States v. Sciolino*, No. 2:09–CR–0070 FCD, 2009 WL 2914570, at *3 (E.D. Cal. Sept. 9, 2009) ("The Fifth Circuit, Eighth Circuit, and numerous district courts have also explicitly held that a defendant bears the burden of proving he was in custody at the time incriminating statements were made.") (collecting cases)).

reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of the degree associated with a formal arrest." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Thompson*, 516 U.S. at 112). In conducting this inquiry, a court must "examine all of the circumstances surrounding the interrogation." *Id.* at 2402 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

Examining the totality of the circumstances in this case, there is *some* evidence to support a conclusion that a reasonable person in Defendant's circumstances would not feel that he or she was completely free to leave when two federal agents expressed a "need" to talk in private about a felony offense after those same agents had brandished their weapons (and thereafter holstered them) and imposed some restrictions on the Defendant's and his father's freedom of movement. The Supreme Court has recognized that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

On the other hand, other factors overwhelmingly support a conclusion that the interrogation was noncustodial. The agents' instructions to Defendant and his father to effectively remain within law enforcement's sight during the safety sweep of the house and the execution of the search warrant constituted a temporary and reasonable measure to ensure officer safety and the integrity of the search. Neither Defendant nor his father was handcuffed or physically restrained in anyway and the time period in question was only twenty minutes. A brief restraint on the Defendant's freedom to leave is not inconsistent with a finding that interrogation that occurred thereafter was noncustodial. *See United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (holding interrogation was noncustodial where, among other things, officers told defendant he was not under arrest and could leave, even though defendant and his wife were ordered to stay seated in the living room and could not move freely throughout their house).

In any event, the Second Circuit has held that "[t]he free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody."

*Newton*, 369 F.3d at 670. In doing so, it acknowledged that in *Berkemer v. McCarty*, 468 U.S. 420 (1984), the United States Supreme Court found that motorists subject to routine traffics stops would generally not feel "free to leave" the scene of the stop and yet such motorists were not in custody for purposes of *Miranda*. *Newton*, 369 F.3d at 669 (citing *Berkemer*, 468 U.S. at 436).[4] For this reason, "[t]he ultimate inquiry for determining *Miranda* custody is . . . whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Newton*, 369 F.3d at 670 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quotation omitted)). For the following reasons, the evidence here falls far short of establishing that Defendant was subjected to a restraint on his freedom of movement commensurate with a formal arrest.

First, although it is possible for a suspect to be in custody in his or her own home,[5] courts generally find that interrogation in such familiar surroundings is not custodial interrogation. *See United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. 1987) ("Lower courts . . . almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers.") (collecting cases); *United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009) ("We have held that an interrogation conducted in familiar surroundings weighs against a finding that defendant was in custody.").

Second, when questioned, Defendant was not only in familiar surroundings but had access to the outdoors and was visible to his neighbors and his father. *See United States v. Penalo*, 516 F. Supp. 1042, 1048 (E.D.N.Y. 1981) (denying motion to suppress where "the statements were made in an open and public place"); *United States v. Zaleski*,

---

[4] The Second Circuit nonetheless distinguished an investigatory stop from custodial interrogation and "rejected Fourth Amendment reasonableness as the standard for resolving *Miranda* custody challenges." *Newton*, 369 F.3d at 673.

[5] *See, e.g., Orozco v. Texaco*, 394 U.S. 324, 325-27 (1969) (holding that defendant, who awoke at 4:00 a.m. to questioning by four law enforcement officers while he was in bed and who, according to one of the officers, was "under arrest" "[f]rom the moment he gave his name[,]" was entitled to *Miranda* warnings).

7

559 F. Supp. 2d 178, 189 (D. Conn. 2008) (noting that "[c]ourts are generally more likely to find interrogation to be non-custodial when it takes place in familiar surroundings, or in public, rather than at a police station."). Indeed, at all times, Defendant had at least two means of leaving the interview--either walking off the patio to the outdoors or entering the home and rejoining his father.

Third, nothing the agents said or did transformed the interview into a custodial interrogation. They advised the Defendant that he was not under arrest, did not need to talk to them, was free to leave, and that any conversation was "consensual." "Decisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

Fourth, the interview lasted only forty-five minutes and was not a "marathon session designed to force a confession." *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985); *see also United States v. Lifshitz*, 2004 WL 2072468, at *8 (S.D.N.Y Sept. 15, 2004) (holding that "interview [that] was not overly long[,] lasting approximately 45 minutes to one hour" was non-custodial).

Fifth, the agents questioned the Defendant in a normal, conversational manner and did not employ force, trickery, or deceit. *See United States v. Guarno*, 819 F.2d 28, 31-32 (2d Cir. 1987) ("[W]e have held that 'in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or allow the suspect to do so.'"); *Bassignani*, 575 F.3d at 884 (finding no custodial interrogation where suspect was questioned in his workplace regarding child pornography and where "nearly the entire two and a half hour interview was conducted in an open, friendly tone" and suspect "participated actively.").

Finally, Defendant was not arrested at the conclusion of the interview. Courts generally find this factor weighs heavily in favor of finding interrogation noncustodial. *See Guarno*, 819 F.2d at 32 (holding defendant was not "in custody" when he was neither

8

placed under arrest, threatened with arrest, nor arrested after interview in motel room but rather was told he was "free to leave . . . whenever he wished to do so."); *United States v. Lowen*, 647 F.3d 863, 868 (8th Cir. 2011) (noting that officers "did not arrest [defendant] upon completion of the questioning" and finding that defendant was not in custody for *Miranda* purposes); *United States v. Titemore*, 335 F. Supp. 2d 502, 507 (D. Vt. 2004) (defendant was not in custody when, among other things, trooper "left the residence without arresting Titemore.").

Because the totality of the circumstances in this case clearly supports a conclusion that Defendant was not in custody when he was questioned on his back patio, he was not entitled to *Miranda* warnings.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. 12) is DENIED. SO ORDERED.

Dated at Rutland, in the District of Vermont, this 3rd day of February, 2012.

*/s/ Christina Reiss*

Christina Reiss, Chief Judge
United States District Court